09-5349-cr(L)
United States v. Mahaffy, et al.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

_____

August Term, 2011

(Argued: March 5, 2012                                    Decided: August 2, 2012)

Docket No. 09-5349-cr(L) 09-5352-cr(con), 10-0036-cr(con), 10-0181-cr(con), 10-0154-cr(con),
10-835(con), 10-2996(con), 10-3091(con), 10-4634-ag(con)

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

KENNETH E. MAHAFFY, JR., LINUS N. NWAIGWE, TIMOTHY O'CONNELL, DAVID G. GHYSELS,
KEEVIN H. LEONARD, ROBERT F. MALIN,

*Defendants-Appellants*.

_____

KENNETH E. MAHAFFY, JR.,

*Petitioner*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

_____

Before: MCLAUGHLIN, B.D. PARKER, and WESLEY, *Circuit Judges*.

Appeal from judgments of conviction in the United States District Court for the Eastern
District of New York (Gleeson, *J*.), following retrial, on conspiracy to commit honest services
and property fraud. *See* 18 U.S.C. §§ 1348, 1349. After sentencing, the government disclosed
transcripts of depositions taken by the SEC prior to the first trial. We hold that the transcripts

contained material that was required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), and that the district court did not adequately instruct the jury that it had to find bribery in order to convict under an honest services fraud theory of conspiracy to commit securities fraud.

VACATED and REMANDED.

_____

ANDREW J. FRISCH (Jeremy B. Sporn, *on the briefs*), Law Offices of Andrew J. Frisch, New York, NY, *for Defendant-Appellant* Kenneth E. Mahaffy, Jr.

DONNA R. NEWMAN, New York, NY, *for Defendant-Appellant* Linus N. Nwaigwe.

YUANGCHUNG LEE, Federal Defenders of New York, Inc., *for Defendant-Appellant* Timothy O'Connell.

SUSAN WOLFE, Hoffman Pollok, LLP, New York, NY, Matthew Brissenden, Garden City, NY, *for Defendant-Appellant* David G. Ghysels.

THOMAS F.X. DUNN, New York, NY, Mitchell Alan Golub, Golub & Golub, LLP, New York, NY, *for Defendant-Appellant* Keevin H. Leonard.

SUSAN G. KELLMAN, Law Offices of Susan G. Kellman, Brooklyn, NY, *for Defendant-Appellant* Robert F. Malin.

JAMES F. MCMAHON, Assistant United States Attorney (David C. James, Claire S. Kedeshian, Assistant United States Attorneys, *on the brief*), *for* Loretta E. Lynch, United States Attorney, Eastern District of New York, *for Appellee* United States of America.

HOPE H. AUGUSTINI, Senior Litigation Counsel (Mark D. Cahn, General Counsel, Jacob H. Stillman, Solicitor, *on the brief*), *for Appellee* Securities and Exchange Commission.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

This appeal arises from an indictment that charged that traders employed by several brokerage firms conspired with employees of A.B. Watley, a day trading firm, to commit securities fraud by providing confidential information belonging to their employers to Watley. After a first trial in 2007 in the United States District Court for the Eastern District of New York (Glasser, *J.*), the jury acquitted the defendants on thirty-eight of thirty-nine counts.[1] The jury hung, and the court subsequently declared a mistrial, on the remaining count, which charged the defendants with conspiring to commit securities fraud. *See* 18 U.S.C. §§ 1348, 1349. In 2009 the government retried the conspiracy count before Judge John Gleeson, with honest services fraud and property fraud as the charged objects of the conspiracy. After a jury deadlock and a supplemental charge, the jury convicted all defendants under each of those theories. The Supreme Court subsequently decided *Skilling v. United States*, 130 S. Ct. 2896 (2010), which limited the scope of the honest services fraud statute to cover only fraudulent schemes effectuated through bribes or kickbacks. *Id.* at 2928, 2933.

Shortly after sentencing, the SEC initiated administrative proceedings against defendant Kenneth Mahaffy. In connection with those proceedings, the SEC disclosed in December 2009 and January 2010 30 transcripts of investigative depositions taken as early as December 2004. Once they had access to those transcripts, the defendants moved for a new trial, contending that 12 of the transcripts included material required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, they contended that information in the transcripts contradicted

---

[1] The defendants were acquitted on twenty substantive securities fraud counts (18 U.S.C § 1348), one Travel Act conspiracy count (18 U.S.C. § 371), eleven substantive Travel Act counts (18 U.S.C. § 1952), and various other counts.

3

orlundermined the testimony of key government witnesses on a central question at trial, namely, whether the allegedly misappropriated information was confidential under *Carpenter v. United States*, 484 U.S. 19 (1987). The district court criticized the government's conduct but ultimately concluded that the jury would not have reached a different result had the transcripts been disclosed.

We disagree. We conclude that the government's failure to disclose portions of the transcripts violated *Brady* and that these *Brady* violations undermined confidence in the jury's verdict. Therefore, we vacate the misappropriation of confidential information component of the conspiracy convictions. Finally, because the district court did not adequately instruct the jury on the scope of honest services fraud, we vacate the honest services fraud component as well.

**BACKGROUND**

The operative indictment charged that Mahaffy, Timothy O'Connell, and David Ghysels, who were employed by various brokerage firms as stockbrokers to private clients[2] (the "Broker Defendants"), committed securities fraud by providing confidential information belonging to their employers to the day trading firm A.B. Watley. During the relevant time period, O'Connell worked at Merrill Lynch, Mahaffy was O'Connell's partner there until he left to join Smith Barney/Citigroup, and Ghysels worked at Lehman Brothers. Robert Malin ran Watley's day-to-day operations and, along with other family members, owned the firm. Linus Nwaigwe was

---

[2] As private client brokers, the Broker Defendants assisted clients in executing the purchase and sale of blocks of shares of stocks.

4

Watley's compliance officer, and Keevin Leonard recruited and supervised Watley's day traders.[3, 4]

Merrill, Smith Barney, and Lehman each had an internal communications system with devices colloquially known as "squawk boxes" or "hoots" located throughout the firm. During the day, firm personnel transmitted internal communications ("squawks") concerning a variety of securities trading matters. A small portion of that information related to pending client orders for specific blocks of particular securities, though clients' identities were never disclosed over the squawk boxes. According to brokerage firm representatives who testified at trial, squawks concerning block orders were transmitted in order to allow each firm's traders to find a client to take the other side of the squawked trade. If the firms could thereby keep both sides of trades in house, they could earn commissions on both sides while avoiding exposing the trades to external market fluctuations.

The indictment alleged a scheme in which the Broker Defendants placed phone receivers up to their respective squawk boxes and transmitted squawks over open phone lines directly to Watley, where traders then placed trades in the squawked securities before the brokerage firms executed the squawked customer orders. The government alleged that by engaging in that behavior, sometimes referred to as "frontrunning," Watley hoped to buy or sell shares at a more attractive price than would have been available once the squawked customer orders were executed. The government contended that, in exchange for providing access to the direct feeds

---

[3] We refer to Malin, Nwaigwe, and Leonard, collectively, as the "Watley Defendants."

[4] Watley's traders were propriety traders, meaning that they executed trades using Watley's funds and on Watley's behalf. In that capacity, they bought and sold stocks within the same trading day, closing all trading positions by the day's end.

of squawks, Watley placed "wash trades" with the Broker Defendants in which Watley traders simultaneously bought and sold the same security at the same price through different accounts. These trades presented no real economic risk or upside and served only to generate commissions for the Broker Defendants. Those commissions were allegedly bribes meant to compensate the Broker Defendants for the squawk feeds they transmitted, as was a $500 cash payment that a Watley trader made to Mahaffy.

The government's theory was that the Broker Defendants defrauded their employers of confidential information by directly transmitting squawks to Watley. The viability of that theory depended on, among other things, the government proving beyond a reasonable doubt that the squawked information was confidential.

There is no real dispute that each of the Broker Defendants used open phone lines to transmit squawk box feeds directly to Watley, or that Watley sought to take advantage of that information by frontrunning. In early 2002, Malin hired day trader Jay Amore,[5] first as a consultant to Watley and later as the firm's Chief Executive Officer. Amore brought former co-workers with him, including Leonard, along with access to Mahaffy's Merrill squawk box and Ghysels' box at Lehman. According to Amore, he had used that access to frontrun at his prior day trading firm and he planned to do the same at Watley.

After Amore demonstrated his frontrunning strategy to Malin and others, Leonard hired more than a hundred day traders to implement the strategy. The brokerage firms' squawks were transmitted over speakers throughout Watley, apparently loudly enough to be heard on Watley's

---

[5] As discussed below, Amore served as a cooperating witness and his testimony was central to the government's case.

trading floor and in individual offices, including Malin's and Nwaigwe's. Watley's traders listened to the squawks and bought or sold in front of squawked trades whenever possible. They never took the other side of one of the brokerage firms' squawked trades.

The first trial had proceeded on one count of conspiracy to commit securities fraud, twenty substantive securities fraud counts, one count of conspiracy to violate the Travel Act, eleven substantive Travel Act counts, and several counts charging substantive witness tampering, conspiracy to commit witness tampering, and making false statements. After two months of trial including a week of jury deliberations, the jury hung on Count One, the securities fraud conspiracy count. Aside from convicting O'Connell of one count each of witness tampering and making a false statement,[6] the jury acquitted the defendants on all other charges. The district court declared a mistrial on Count One.

After the government indicated its intention to retry the defendants on Count One, the defendants moved to bar the retrial on double jeopardy and collateral estoppel grounds, contending that their acquittal on Count Twenty-Two, the Travel Act conspiracy count, precluded retrial. The district court denied the motion. *United States v. Mahaffy*, 499 F. Supp. 2d 291 (E.D.N.Y. 2007). After an interlocutory appeal we affirmed, holding that because it was not possible to determine the reasons underlying the Count Twenty-Two acquittal, it was not possible to determine whether the verdict necessarily decided facts that would bar a new trial. *United States v. Mahaffy*, 283 F. App'x 852 (2d Cir. 2008) (summary order).

---

[6] O'Connell has not challenged his witness tampering conviction on appeal. A panel of this Court previously vacated O'Connell's false statement conviction. That count was later dismissed. *United States v. Mahaffy*, 285 F. App'x 797 (2d Cir. 2008).

In the retrial, the defendants were each charged with one count of conspiracy to commit securities fraud under 18 U.S.C. §§ 1348 and 1349 on two theories: (1) that the Broker Defendants deprived their employer firms of their honest services ("honest services fraud") under 18 U.S.C. § 1346 ("honest services fraud"); and (2) that, when they transmitted squawks directly to Watley, the Broker Defendants deprived their employer firms of confidential information, which qualified as property ("property fraud") under *Carpenter v. United States*, 484 U.S. 19 (1987).[7] A critical issue was whether portions of the squawked information actually were confidential. There is no dispute that the majority of squawked information was not confidential, instead consisting of publicly available information including research, indications of interest, advertising, general "market color," and other items that did not include actual block order information.

The evidence at the retrial, which lasted roughly three weeks, focused in large part on the manner in which the Broker Defendants' respective employer firms treated squawks and squawked information, and the consideration that flowed between the defendants in respect of the squawked information. To make its case, the government called a representative from each of the employer firms to testify that his firm regarded the client order information as confidential information that brokers should not have disseminated to Watley. On cross-examination, defense counsel elicited testimony that the firms did not train brokers on proper use of squawks or squawk boxes and that, although each firm had a written policy concerning the confidentiality of client order information generally, throughout the relevant period none of the firms had a

[7] Under *Carpenter*, 484 U.S. at 26-27, a business's information may be confidential if the business exclusively possesses the information and considers it to be, and treats it as, confidential.

8

policy that specifically addressed how employees should treat squawks or squawk boxes or that expressly delineated squawked information as confidential. The defendants also introduced evidence that squawks were broadcast and freely available through firm offices, including to non-employee visitors; that brokers were expected to share clients' block orders with certain other clients; and that firm supervisors were aware of the Broker Defendants' direct transmission of squawks. Based on that evidence, defense counsel argued during summations that squawked information was not confidential.

After two days of deliberation, the jury declared itself deadlocked. The next day, the jury asked to have the court's instructions read back, and then requested a "plain English" definition of conspiracy to defraud the brokerage firms of honest services and conspiracy to defraud the brokerage firms of property. Over defense objection, the district court drafted and delivered a supplemental charge. The jury returned a guilty verdict approximately thirty minutes later.

Shortly after sentencing, the SEC disclosed the thirty transcripts to the defendants. As we discuss below, the transcripts included *Brady* material. Most importantly, the transcripts contained information that contradicted testimony from key government witnesses on the central question whether the Broker Defendants misappropriated confidential business information from their employers.

The prosecutions were products of close collaboration between the United States Attorney's Office and the SEC, and the government's trial teams each consisted of ostensibly experienced attorneys from both offices. Several weeks prior to the first trial, Sandeep Satwalekar – the primary SEC staff attorney investigating the case who conducted almost all of

the SEC depositions, who was cross-designated as a Special AUSA, and who sat at counsel table during the trial – emailed two of his colleagues on the trial team, AUSAs Michael Asaro, the lead prosecutor, and Sean Casey, the Deputy Chief of the Business and Securities Fraud Unit. He specifically cautioned them that portions of at least one of the deposition transcripts contained possible *Brady* material:[9]

> This is the last time I will bring this possible Brady issue up, but look over this excerpt when you get a chance. Tell me whether this requires some disclosure to defense counsel. . . . "

There is no question that the government knew about the transcript that Satwalekar attached, along with the other twenty-nine transcripts, prior to the first trial. Satwalekar conducted the majority of the depositions. Nine of the twelve on which the defendants based their *Brady* motion below took place after the initial indictment. The government possessed all thirty transcripts within its electronic database. Ultimately, however, neither the excerpt that Satwalekar sent to his colleagues nor any other portion of the SEC depositions was disclosed in connection with the first trial.

The second trial team also failed to disclose any of the transcripts. Although it was aware of the transcripts and had read some of them prior to the retrial, the second team elected not to revisit disclosure decisions, relying instead on the first team's decisions.

After the government disclosed the transcripts, the defendants moved for a new trial on the ground that twelve of them were *Brady* material. The district court denied the motion.

---

[9] The excerpt was from the deposition of Brian Hull, a high-ranking Merrill employee, who testified before the SEC that squawked block order information was not confidential because it was "in the marketplace or could be in the marketplace," and that he "d[id]n't think there's actually anything wrong with" brokers directly transmitting squawks. As discussed below, *see infra* pp. 20-21, this information was unquestionably *Brady* material.

*United States v. Mahaffy*, No. 05-CR-613, 2010 WL 2925952 (E.D.N.Y. July 21, 2010). This appeal followed.

**DISCUSSION**

**I.**

We begin by discussing the defendants' challenge to the sufficiency of the evidence. We do so in order to set out details of the prosecution's case, particularly with regard to the brokerage firms' treatment of allegedly confidential squawked information. The defendants argue that, at the retrial, the government did not introduce evidence sufficient to prove that: (1) the Broker Defendants misappropriated their employers' confidential information; (2) the Broker Defendants made affirmative misrepresentations or breached an employer-imposed disclosure duty; (3) the Broker Defendants engaged in bribery; or (4) Nwaigwe knew that confidential information was transmitted from the brokerage firms to Watley.

We review a challenge to the sufficiency of the evidence *de novo*, considering if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt. *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008). If we determine that the government failed to introduce sufficient evidence at the retrial, the Double Jeopardy Clause would bar a third trial. *Richardson v. United States*, 468 U.S. 317, 323 (1984); *Burks v. United States*, 437 U.S. 1, 18 (1978).

"To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance

11

of the conspiracy was committed." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (quotation marks omitted). Although neither *Carpenter* nor the case law interpreting it have clearly stated what is required to prove that an employer's information is confidential, the government and the defendants do not dispute that, under *Carpenter*, the brokerage firms had to treat squawked information as confidential by, among other things, maintaining their exclusive use over it. With regard to the property fraud object, then, the government was required to prove that the defendants knowingly agreed to participate in a scheme that involved the misappropriation of squawks that they knew – based in part on the firms' conduct – constituted confidential information. *See United States v. Wallace*, 85 F.3d 1063, 1068 (2d Cir. 1996) (defining unlawful intent in conspiracies as "specific intent to achieve th[e] object [of the conspiracy]").

At the retrial, the government called representatives from each of the brokerage firms who testified that their respective firms considered block order information to be confidential and that each firm expected its brokers and traders to take care and filter squawked information, only transmitting such information to clients whom they had reason to believe might take the other side of a squawked trade. Michael Molnar, former manager of middle markets institutional sales trading at Smith Barney, testified that the confidentiality of block order information is "broker 101" and "such a basic concept of employment and handling confidential information that the business didn't feel obligated to generate a memo to that effect." Similarly, Bradford Deflin, a former senior vice president of Lehman, testified that "the Squawk Box . . . information . . . is used on a need to know basis, again, with professional judgment, and for the purposes of accommodating a transaction and fulfilling . . . client[s'] needs." And Merrill's Henry

12

Mulholland testified that traders "were supposed to use their knowledge of their clients to seek those clients . . . that potentially could provide the other side of [a squawked] trade." He expected traders "to strike a balance between providing . . . enough information, to let that client make a reasoned judgment about whether to transact with us but also to protect the information from the original client."

Each of these firm representatives testified that his firm did not permit its employees to allow outsiders to listen directly to squawks or hear squawks in their entirety. Molnar said that doing so would be "as black and white [a] violation of the [firm's] written policy in the spirit of how we do our business as I can imagine. Just an egregious act. Breach of the trust." Mulholland testified that Merrill did not allow individuals outside the firm to have a direct feed to the squawk box, and did not provide such a feed to anyone. And Deflin testified that holding a phone up to a squawk box violated Lehman's code of conduct, which required employees to "be discrete" with customer order information. Finally, the government introduced written policies from each firm regarding the confidentiality of customer order information.

The government also introduced evidence that the Broker Defendants knew that their respective firms treated squawked information as confidential. Each of the Broker Defendants was Series 7 licensed. Various witnesses testified that, in order to pass the Series 7 exam, an individual would have known of the dangers of frontrunning and an accompanying need to keep block order information confidential. Amore, a witness for the government and former Watley trading head, testified that he promised Mahaffy and Ghysels that he would "execute away" if "something got too close to home," and that he would "pay [their] bar tab." An acceptable inference, which the government argued, is that in order not to raise suspicions within the

13

brokerage firms, Amore would have his traders execute their frontrunning trades through brokerage houses other than the ones to whose squawks he listened, and that he would compensate the Broker Defendants in exchange for squawked information. Based on that testimony, the jury reasonably could have concluded that Mahaffy and Ghysels knew that they had to hide their conduct from their employer firms, and that they were to be compensated, for engaging in improper behavior.

Other evidence also supports a conclusion that the Broker Defendants knew their conduct was illegal and that disseminating squawks violated their firms' confidentiality policies. O'Connell asked his trading assistant, cooperating witness Irene Santiago, falsely to tell Merrill attorneys that he never put his phone next to his squawk box. Ghysels transmitted squawks over a cell phone that he kept in a drawer rather than out in the open, and that cell phone was in the name of a Watley trader rather than his own. Ghysels argues that his conduct was innocent, and that might be correct. But a jury reasonably could have inferred that Ghysels's actions were intended to conceal conduct that he knew was illegal and violated firm policy.

Lastly, and perhaps most tellingly, evidence showed that Watley traders never took the other side of a squawked order. A jury reasonably and permissibly could have concluded, therefore, that the Broker Defendants knew that they were not transmitting squawks for the accepted purpose of finding the other sides of squawked trades.

The defendants also argue that the government failed to prove false representations or material omissions, which are required to secure convictions, pursuant to the government's property fraud theory, under 18 U.S.C. § 1348(2). First, we note that the indictment charged the

14

Defendants with violating 18 U.S.C. § 1348, rather than either particular subsection of the statute. 18 U.S.C. § 1348 provides that:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
> > (1) to defraud any person in connection with any commodity for future delivery, . . . or any security of an issuer with a class of securities registered under section 12 of the [Exchange Act] or that is required to file reports under section 15(d) of the [Exchange Act]; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of . . . any security of an issuer with a class of securities registered under section 12 of the [Exchange Act] or that is required to file reports under section 15(d) of the [Exchange Act];
>
> shall be fined under this title, or imprisoned not more than 25 years, or both.

The district court's jury charge, which the defendants do not challenge in this respect, instructed the jury to find each defendant guilty if the jurors unanimously concluded beyond a reasonable doubt that he knowingly and intentionally violated, or aided and abetted the violation of, either subsection 1348(1) or 1348(2). False representations or material omissions are not required for a conviction under § 1348(1). *See, e.g.*, *United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (identifying elements of securities fraud under § 1348(1) as (1) fraudulent intent, (2) scheme or artifice to defraud, and (3) nexus with a security). Accordingly, the jury could have convicted under § 1348 without considering false representations or material omissions.

Second, even if the jury were required to find either affirmative misrepresentations or violations of an employer-based duty to disclose, the government introduced sufficient evidence. "[T]he concealment by a fiduciary of material information which he is under a duty to disclose to

15

another under circumstances where the non-disclosure could or does result in harm to another is a violation of [the fraud statutes]." *United States v. Newman*, 664 F.2d 12, 19 (2d Cir. 1981) (citation and quotation marks omitted), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987). Although this rule may not be "used in bootstrap fashion by finding an obligation to disclose in every breach of fiduciary duty," *id*., the evidence here was sufficient to establish that the Broker Defendants each violated employer-imposed disclosure obligations. Each brokerage firm had a policy that required employees to report violations of the firm's code of conduct. As discussed above, there was sufficient evidence that transmitting squawks violated these policies. We believe that this evidence was sufficient for a jury to have concluded beyond a reasonable doubt that each Broker Defendant violated an employer-imposed disclosure obligation.

Next, the defendants contend that there was insufficient evidence of bribery to support an honest services fraud conviction. We disagree. After *Skilling*, it is clear that to convict a defendant of honest services fraud, the government must prove paradigmatic kickbacks (which were not charged or at issue here) or bribery. *Skilling*, 130 S.Ct. at 2933; *see* Part IV *infra*. There is no genuine dispute that the Broker Defendants earned commissions from trades that Watley traders placed through the Broker Defendants or that no Watley trader ever took the other side of a trade that he learned about from a squawk. These facts, alone, are sufficient for a jury to determine that the Broker Defendants received money in the form of commissions from Watley traders in exchange for direct access to squawk box feeds. There was also evidence that, on one occasion, Mahaffy received a $500 cash payment from Watley trader Keith Rogers.

16

Although Mahaffy argues that that payment was not a bribe, a jury reasonably could have concluded otherwise.

Nwaigwe argues that there was insufficient evidence that he knew that the squawked information Watley received from the Broker Defendants was confidential. We disagree. Amore testified that Nwaigwe, who was Watley's compliance officer, approached him and demanded a raise based on the risk that Watley was taking, ostensibly referring to Watley's frontrunning scheme. Amore further testified that Nwaigwe "pretty much kn[ew] what [wa]s going on. He want[ed] more money if he's going to participate." Amore, Malin, and Malin's brother decided to give Nwaigwe the raise he demanded because Malin did not know "how he would get another compliance officer in here that would let the squawk boxes be front running all day long."

In addition, at one point, the NASD conducted an on-site inspection of Watley. Nwaigwe, as the firm's compliance officer, learned of the pending inspection in advance, and told Amore that he was concerned about the squawk box transmissions. Amore, Nwaigwe, Malin, and others then had a meeting where they decided, in order to avoid NASD scrutiny, to give headphones to the Watley traders so that they could listen to squawks without having the squawks broadcast over the firm's loudspeakers, as they usually were.

Last, evidence indicated that Nwaigwe falsely testified to the SEC regarding Watley's use of squawked information. Nwaigwe told the SEC that he had never heard of a squawk box. Various witnesses, however, testified that they discussed squawk boxes with Nwaigwe, and three witnesses testified that the squawk box broadcasts at Watley were loud enough to be heard in

17

Nwaigwe's office.[10] Taken as a whole, the evidence against Nwaigwe was sufficient for the jury to find that he knew the squawks Watley received were confidential and that he knowingly agreed to participate in a scheme to transmit that information to Watley.

**II.**

We turn now to whether the government improperly withheld *Brady* material. When reviewing alleged *Brady* violations, we examine the record *de novo* to determine whether the information in question is material as a matter of law. *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005). The trial judge's factual conclusions as to the effect of nondisclosure are entitled to great weight. *Id*.

*Brady* requires that the government disclose material evidence favorable to a criminal defendant. *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). Evidence is favorable if it is either exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quotation marks omitted). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but rather, a conviction must be reversed "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quotation marks omitted).

---

[10] Nwaigwe was acquitted at the first trial of making false statements to the SEC. He argues that evidence of that acquittal should have been admitted at the retrial. That argument fails. "[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted." *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir. 1979).

For the government to secure convictions under its property fraud theory, it had to prove beyond a reasonable doubt that the brokerage firms had exclusive use of the squawked information, considered that information to be confidential, and that they treated it as such. *Carpenter*, 484 U.S. at 26-27.[11] Consistent with *Carpenter*, the jury was instructed to consider whether the government proved that the brokerage firms regarded the block order information contained in squawks as confidential and treated it as such. The government's evidence on that point (discussed *supra* Part I) included testimony from brokerage firm representatives concerning each firm's confidentiality policy. Because the defendants lacked the SEC depositions and admissible evidence to which those depositions might have led, the jury viewed and heard primarily government evidence. In contrast to the picture the government presented, however, several of the witnesses who testified before the SEC, including senior personnel from Merrill, Smith Barney, and Lehman, squarely contradicted that picture. They testified that squawked information was not confidential and that no firm policies prohibited the direct transmittal of squawks outside each respective firm. We now consider the transcripts.

Brian Hull supervised Mulholland, the head of U.S. trading for Merrill's institutional equity department, whom the government called as Merrill's corporate representative at both

---

[11] In *Carpenter*, the Court affirmed a *Wall Street Journal* reporter's property fraud conviction after he gave advance notice to two stockbrokers of particular stocks he intended to cover in his "Heard on the Street" column. The Court concluded that that information was confidential because it was the "official policy and practice" at the *Journal* that the column's contents were confidential prior to publication and the Journal "had a right to decide how to use" that information prior to disclosing it to the public. *Id*. at 23, 25-28. "[E]xclusivity is an important aspect of confidential business information," and the facts that the Journal intended for its employee to keep the contents of his column private until publication, and that the employee knew that, exposed him to criminal fraud liability. *Id*. at 26-27.

19

trials. In contrast with Mulholland's trial testimony that Merrill did not allow direct feeds from the firm's squawk boxes to individuals outside the firm, Hull had testified before the SEC that

> when you go over the squawk box to a larger community [within the firm], knowing that the people that are going to hear that are going to then make several calls each hoping to find the other side [of a trade], that information will get spread or be out in the marketplace or broader. . . . [T]hat part of the order that [brokers are] showing to the marketplace is no longer confidential, just as if you were working it on the floor of the stock exchange and showing it into the crowd that you were a buyer and displaying it on the book, it's no longer confidential.

**[JA 502]** Hull elaborated on this theme further, stating that, although "[c]lient orders and client relationships are always confidential,"

> when the trader goes over the squawk box and gives an indication, he could have already . . . put that order on the floor and could be in the crowd displaying that interest as well. . . . So when I say confidential, I don't want to take away that we have a confidential relationship with our client, but that order is in the marketplace or could be in the marketplace.

He made the same point repeatedly.

Hull also discussed Merrill's responsibility to handle client orders "with the appropriate amount of care," and that it was important for Merrill's traders "to use professional judgment and discretion in how they convey to their customers the order information that [they] have heard over the squawk box." When asked what was wrong with transmitting squawked information directly, however, Hull replied that he "d[id]n't think there's actually anything wrong with it."

Joseph Lauricella was a Merrill branch manager with compliance responsibilities. He supervised the firm's account with Warren Fellus, a cooperating witness and day trader who had worked at Watley and then later at Millennium Brokerage LLC. At trial, Fellus testified that he

received direct transmissions of squawks from Merrill while at both Watley and Millennium.

Ronald Ledwith was a broker at Merrill who reported to Lauricella.

During their SEC depositions, Lauricella and Ledwith both testified about a Merrill broker, Matt Shulman, who had transmitted squawks directly to Millennium. The two together phoned Merrill's compliance manager Howie Geiler to tell him that Shulman was transmitting squawked information to Millennium word for word. Lauricella indicated that he did not "see the difference between . . . whether or not [a phone] was held up to the machine or if someone is just repeating it word for word." In response, according to Lauricella, Geiler said that "he never knew of any rule that said you could not broadcast that information," and that "in the old days people used to actually come into the office and listen to [the squawk box] directly in the office." Geiler then told Lauricella that "he was going to research it. He said he had never heard of such a rule. . . . He spoke about how he is going to triple check and make sure there is no rule or anything like that." When Geiler called Lauricella back, he "said he checked all the rules," and "[n]o one has ever heard of a rule. . . . Between all of us [with a combined] 100 years of experience [at Merrill], . . . [Geiler] said he never heard of a rule that you can't disseminate the information on a squawk box." When asked if anyone from Merrill ever told Lauricella that "you had to be careful in using a squawk box because of a risk of front-running," Lauricella responded, "No. It was actually the exact opposite the way I understood it. The people at the desk described it as it wasn't the magic bullet to try to trace or monitor any type of portfolio. . . . It was akin to reading tea leaves." In other words, Lauricella had testified before the SEC that he did not believe that transmitting squawks actually threatened to lead to manipulated prices in the market as a result of front-running.

Similarly, Ledwith testified that Geiler told Lauricella and him that Geiler had "never heard of a prohibition on using the box," and that Geiler had consulted his boss, Tom Tiedman, who also did not think there was any prohibition on transmitting squawked information. And when Ledwith asked another supervisor "if it was okay to provide direct access to . . . [t]he squawk box feed to the outside client," the supervisor told him that "some people just pick up the phone and call their clients all day long."

Robert Moore was a Smith Barney position trader who had been the head of various trading groups, including U.S. equities and U.S. cash trading. He testified before the SEC that Smith Barney's squawks were "sensitive, not confidential": sensitive because "the job of every capital markets person in equities was to execute an order . . . with the least amount of market impact," but not confidential because "when you advertise [a customer's order], at some point, you are going to have to act on that order, so [if one went] down to the floor of the New York Stock Exchange, one could see that Citigroup is buying that stock."

Michael Legieza worked at Lehman as, alternately, co-head of the firm's New York office, administrative manager of the New York office, and the firm's Business Control Manager for private investment management. He testified before the SEC that he "d[id]n't know what the purpose of having a [squawk] system would be if it weren't to facilitate the communication of information to the appropriate people within the organization and then ultimately to our customer base," and that, although "there is always a judgment to be made and information may not be relevant to all clients," disseminating squawked information broadly was not necessarily prohibited. Legieza further testified that, at a point in time when he was responsible for

approving requests for access to Lehman's squawk boxes, he did not believe that squawked information was confidential and no one ever told him that such information was confidential.

Carlos Romero was Ghysels's partner at Lehman. His SEC deposition in large part concerned his and Ghysels's relationship with Amore, the key government cooperator. Amore testified at trial that he had made clear to brokerage firm employees who transmitted squawks to him that he planned to facilitate improper frontrunning of those trades. But Romero had testified to the contrary before the SEC. Romero testified that Amore had told him that Watley was interested in squawked information in order to "have color" regarding pending block buy or sell orders in order potentially to take the other side of trades. Romero also suggested that the practice of transmitting squawks over open phone lines was widespread throughout Lehman when he testified that, during a visit to Lehman's New York office, he saw another broker's desk with a phone receiver sitting on top of a squawk box.

Donald Lee was a Watley trader who placed trades with Merrill. At trial, after the district court denied a motion in limine by Mahaffy, the government introduced an email exchange in which Mahaffy asked Lee if Lee "need[ed] to be hooked up," and Lee responded that he did not. The government argued that being "hooked up" meant that Mahaffy would provide Lee with access to Merrill's squawks. But Lee testified before the SEC that he never frontran, that the traders he worked with at Watley did not employ a frontrunning strategy, and also that he did not remember Mahaffy's providing information about block orders.

On appeal, the government advances a host of excuses as to why this testimony was not *Brady* material. It argues that: (1) taken as a whole, the testimony of Hull, Moore, Legieza and others is consistent with the government's prosecution theory and reinforces that squawks were

23

to be used only to find the other side of trades, and that brokers were required to handle squawked information with appropriate care; (2) Lauricella's and Ledwith's testimony is not exculpatory because they mistakenly believed that Shulman transmitted squawks to Millennium in order to find the other side of trades; (3) testimony from Lauricella and Ledwith (and Geiler) would have been inadmissible as irrelevant hearsay that would have confused the jury and wasted time; (4) Romero's deposition testimony did not add to what was already available to the defense because Ghysels knew that Romero had a conversation with Amore; (5) Lee's testimony was not suppressed because Mahaffy would have known, without the testimony, whether he offered to provide Lee with a squawk box feed; and (6) the distinction Moore drew between sensitive and confidential information should be disregarded because he did not understand or use "confidential" as a legal term. None of this excuses the government's misconduct.

The transcripts contained substantial *Brady* material, much of which was easily identified as such. The fact that the government is able to argue that portions of the transcripts were consistent with the prosecution's theory fails to lessen the exculpatory force of sworn SEC testimony from senior members of the brokerage firms, that squawked information was not confidential or treated as such. Where suppressed evidence is inculpatory as well as exculpatory, and "its exculpatory character harmonize[s] with the theory of the defense case," a *Brady* violation has occurred. *United States v. Triumph Capital Grp.*, 544 F.3d 149, 164 (2d Cir. 2008); *Rivas*, 377 F.3d at 199-200. Hull, Moore, and Legieza each testified before the SEC that information concerning pending customer orders was intended to be, and was, frequently broadcast broadly to firm customers and on the floor of the stock exchange. That testimony harmonizes with the defendants' theory that their respective employer firms did not treat

24

squawked information as confidential or take steps to prevent its disclosure. The brokerage firms may have expected that employees would treat client order information with care and would actively filter squawked information before disseminating it externally, as the government's witnesses testified. If jurors had been privy to the withheld SEC testimony, they might still have concluded that the brokerage firms took steps sufficient to render squawked information confidential. On the other hand, they could just as well have concluded that whatever care brokers were supposed to exercise, the firms' actions – including corporate policies, employee training, and the conduct of other employees who possessed block order information – did not compel the conclusion that squawked information was confidential.

Similarly, Lauricella and Ledwith testified that neither Geiler nor Tiedman was aware of any Merrill prohibition on directly transmitting squawks outside the firm. Any mistaken belief by Lauricella, Ledwith, Geiler, or Tiedman that squawks were being transmitted to Millennium in order to find the other sides of trades does not mean their testimony is immaterial. According to Lauricella and Ledwith, Geiler's conclusion was that there was no policy against directly transmitting squawks, not that firm policy allowed such transmissions but only under certain circumstances. That conclusion, along with Geiler's statement that "in the old days they used to let the clients come in and listen," might have undercut the government's argument that Merrill treated squawked information as confidential. There is a reasonable probability that the jury would have reached a different conclusion if the Lauricella and Ledwith transcripts had been disclosed. *See Youngblood*, 547 U.S. at 870.

The government is correct that Lauricella and Ledwith's testimony contains what appears to be inadmissible hearsay. Even so, items may still be material and favorable under *Brady* if not

25

admissible themselves so long as they "could lead to admissible evidence." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002). That testimony could have led the defendants to interview and possibly subpoena Geiler, Tiedman, and Shulman, who could have identified the other senior Merrill employees with whom Geiler spoke and who were unaware of any firm policy that prohibited the direct transmittal of squawks outside the firm. If their testimony was consistent with Geiler's recounting, it reasonably could have led jurors to conclude that squawked information was not confidential.

For the purposes of our *Brady* analysis, it simply does not matter that Ghysels knew that Romero, his former partner, had a conversation with Amore. Whatever Ghysels knew, he did not know what Romero told the SEC under oath. According to Ghysels, Romero refused to meet with Ghysels's counsel prior to trial. Not knowing what Romero might testify to, Ghysels did not call him at trial.

Aside from exculpatory material, *Brady* applies to material that "would be an effective tool in disciplining witnesses during cross-examination." *Id*. Armed with Romero's SEC testimony, Ghysels quite possibly would have called Romero at trial. If Romero testified consistent with his SEC testimony that he saw another broker in the New York office with his phone up to a squawk box, and also that Amore represented to Romero that he was interested in taking the other side of squawked trades, Romero's testimony would have bolstered Ghysels's defense. If Romero testified otherwise, Ghysels could have confronted him with a prior inconsistent sworn statement in the form of Romero's SEC deposition transcript.[12]

---

[12] The government cites to cases that it contends establish that potentially exculpatory testimony is not considered suppressed where the defense knows the witness's identity. Those cases require more. It is not enough that a defendant knew a potential witness's identity; the

26

In addition, the government argues – and the district court determined – that to the extent the suppressed Romero testimony would have been useful in order to impeach Amore, the testimony is not material because Amore was subject to thorough cross-examination at trial. Specifically, the district court concluded that "Amore was cross-examined extensively at trial, and I have no doubt that additional cross-examination about his failure to mention a meeting with Romero would not have changed the jury's verdict." *Mahaffy*, 2010 WL 2925952, at *6 n.4; *see also United States v. Diaz*, 176 F.3d 52, 108 (2d Cir. 1999) (holding that "suppressed impeachment evidence is not material where the new evidence merely constitutes 'an additional basis on which to impeach a witness whose credibility has already been shown to be questionable'").

Romero's SEC testimony would have done more than merely provide an additional basis for impeachment. It would have called squarely into question the credibility of Amore, the government's key cooperating witness, regarding his claim that he discussed his frontrunning strategy with every broker who provided him with a squawk box feed. Without Romero's testimony, the defendants were able to "chip[] away on cross examination," but were denied "the assault that was warranted." *Kyles v. Whitley*, 514 U.S. 419, 443 n.14. As any trial lawyer knows, "chipping away" question-by-question on cross-examination is far less effective than

defendant had to know "or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989) (quotation marks omitted) (concluding no *Brady* violation where government informed defendants that they "might want to interview" particular witness); *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (no *Brady* violation where government informed defendant that witness's grand jury testimony might be exculpatory). Here, Ghysels did not know that Romero met with the SEC or that his previous testimony might be exculpatory.

using an SEC deposition transcript.  Given that the jury hung at the first trial and was deadlocked prior to the district court's supplemental instruction during the retrial, we cannot be confident that Romero's withheld testimony would have made no difference to the jury's assessment of Amore or to the ultimate question of guilt.

Next, just as Ghysels's knowledge that Romero spoke with Amore does not alter our *Brady* analysis, neither does Mahaffy's knowledge of his own relationship with Lee.  Mahaffy did not know what Lee told the SEC under oath.  The government contends that Lee's testimony is not exculpatory because it did not contradict the inference that Mahaffy offered Lee access to Mahaffy's squawk box.  Although Lee's testimony did not directly address that email from Mahaffy, Lee stated that he did not remember Mahaffy's giving him information about orders. **[JA 599]** Lee might have explained Mahaffy's email in some other way if confronted with his prior testimony.  There could have been a perfectly innocent explanation for Mahaffy's question that Lee understood and would have explained if given the chance.  If Mahaffy had known what Lee told the SEC, Mahaffy would have had a reason to interview Lee prior to trial and perhaps to call him as a trial witness.  Without Lee's deposition transcript, however, Mahaffy was unaware that Lee might contradict inferences the government urged based on evidence it introduced.  Also, as with Romero, Mahaffy would have been able to discipline Lee with his prior testimony if Mahaffy had the transcript and Lee's trial testimony diverged from his SEC testimony.

The exculpatory nature of Moore's SEC testimony goes beyond his statement that squawked information was "sensitive, not confidential."  Moore apparently was reluctant to call information "confidential" because, as a non-lawyer, he did not want to misuse the term.  However, his testimony indicates that squawked information concerning block trades was also

28

available on the floor of the stock exchange. Crucial to the determination whether squawked information was confidential under *Carpenter* is whether the brokerage firms viewed and treated it as such. The distinction that Moore drew appears to be entirely in line with the law: if squawked block order information was publicly available, it might not have been confidential. That conclusion would have flowed from Moore's factual testimony concerning block order information, not the legal terms he used to describe the information. Accordingly, the fact that Moore was not a lawyer does not bear on the materiality or exculpatory nature of his testimony.

The withheld SEC testimony strongly suggests that the brokerage firms did not treat squawked block order information as confidential and that senior employees and management at the respective firms did not bar the transmission of squawks or take steps to maintain exclusive control of pending block order information. Romero's testimony also calls into question Amore's trial testimony that he made his frontrunning strategies known to every broker who transmitted squawks to him, and Lee's testimony cuts against the inference that Mahaffy offered to transmit squawks to Lee. Transcript excerpts such as these which harmonize with a defendant's theories are material and favorable to the defense. After the first trial ended with thirty-eight counts of acquittal and a hung jury on the securities fraud conspiracy count, and the jury in the second trial was deadlocked after deliberating for two days on the retried securities fraud conspiracy count, we have little confidence that the result would have been the same had the government complied with its *Brady* obligations and disclosed the SEC transcripts.[13]

---

[13] Despite the district court's ultimate conclusion that none of the SEC depositions was *Brady* material that warranted a new trial, the court took the prosecution to task, stating that it was "mystified by the government's failure to disclose the testimony of these various witnesses" and expressing frustration at "sifting through the transcripts of testimony taken by the SEC *after* the trial has already occurred" and at the government's decision not to reconsider disclosure

29

The government's failures to comply with *Brady* were entirely preventable. On multiple occasions, the prosecution team either actively decided not to disclose the SEC deposition transcripts or consciously avoided its responsibilities to comply with *Brady*. According to the government, the second prosecution team made an affirmative decision not to review disclosure decisions made by the first trial team, and specifically decided not to disclose the transcript of Romero's testimony, on the ground that the first team consisted of experienced prosecutors. That decision not to review or revisit disclosure decisions compounded the government's failures to turn over the SEC transcripts prior to the first trial.

The government's *Brady* violations have negatively impacted this case in two distinct but related ways. First, the two trials were both unfairly skewed against the defendants, who were forced to mount their defenses without the benefit of material exculpatory and impeaching sworn testimony. Second, the costs of this litigation – in terms of personal, financial and judicial resources and time – have ballooned as a result of the two trials, post-verdict litigation, and two appeals to this court.

Our Court and others have long recognized that *Brady* violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage. When the government impermissibly withholds *Brady* material, "its case [i]s much stronger, and the defense case much weaker, than the full facts would . . . suggest[]." *Kyles*, 514 U.S. at 429. Where, as here, "the government suppressed evidence in its possession which was both exculpatory and impeaching, . . . there is a reasonable probability that if the evidence had been

decisions made by the team prosecuting the first trial. *Mahaffy*, 2010 WL 2925952, at *6. We share the district court's frustration, if not its conclusion.

30

disclosed, the outcome of the proceeding would have been different." *Triumph Capital*, 544 F.3d at 164.  Even if "[i]t is by no means certain that" arguments based on wrongfully withheld evidence "would have swayed the jury, . . . it is a real enough possibility to undermine confidence in the verdict." *Id*. at 163.  As close as the trials were, the defendants' assertion, that there is a reasonable probability that they would not have been convicted had the transcripts been disclosed, strikes with particular force.[14]  Accordingly, we vacate the property fraud component of the defendants' convictions.  In light of the government's mishandling of material exculpatory and impeaching material, we wonder whether the government will choose to subject the defendants to yet a third trial.

**III.**

In order to provide guidance in the event the government commits itself to further proceedings in this case, we address the defendants' challenge to the district court's jury charge concerning the government's property fraud theory.

During the retrial, Ghysels submitted a definition of "confidential business information" as part of a proposed charge on securities fraud.  That charge was, in large part, based on case

---

[14] The government argues that, although it possessed the SEC deposition transcripts, the second trial team was not familiar with those transcripts and did not independently review them. That is of no moment.  "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  Our confidence in the jury's verdict is undermined, and would be whether the *Brady* violations were willful or not.

law concerning civil trade secret claims and would have instructed the jury to consider, when evaluating whether squawked information was confidential:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (discussing whether, under New York law, customer list was trade secret). The district court declined to give that charge, and instead instructed the jury that

> [c]onfidential information acquired by a company in the operation of its business is a form of property, to which the company has the exclusive right and benefit. Here the government claims, alleges that some of the information transmitted within the brokerage houses over the squawk boxes was confidential, not to be disseminated outside the firm by allowing others to listen to the squawks as they occurred, and that the defendants were aware of the confidential nature of at least some of that information.

In its later supplemental charge, the district court instructed:

> The law prohibiting people from scheming to defraud a company of its property recognizes confidential business information as a type of property and that the company has the exclusive – has the right, rather, to the exclusive use of the information. . . . Even if it lacks commercial value to the company, company policy may be to treat the information as confidential to protect the reputation of the company and its customers. What is key is that the company treat the information as confidential and with knowledge of that fact, its employee nonetheless knowingly discloses that information for an improper use.

To prevail on their argument that the district court erred when it declined to give the proposed charge, the defendants must show that it accurately stated the law in every respect and

32

that, viewing the charge actually given in its entirety, they were prejudiced by the court's failure to give the proposed charge. *United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001).

Ghysels's charge would have instructed the jury to consider factors, borrowed from case law discussing trade secrets, that do not necessarily bear on the confidentiality of the squawked information, including the value of the information to the business and business's investment in developing the information. Information may qualify as confidential under *Carpenter* even if it does not constitute a trade secret. Indeed, that may be the case here. For that reason, the proposed charge did not accurately reflect the law in every respect, and the district court did not err when it declined to give it.

Particularly in light of the substance of the improperly withheld *Brady* material, we caution the district court that, if there is another trial, its instruction regarding confidential business information should provide more fulsome guidance to assist the jury in determining whether the squawked information was confidential.[15]

**IV.**

We turn now to the question whether, post-*Skilling*, we must vacate the defendant's convictions under the honest services fraud theory. After the retrial concluded, the Supreme

---

[15] *Carpenter* requires proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information. Should this issue arise in future proceedings, district courts would do well to provide additional guidance to the jury regarding how to evaluate whether employers treat information as confidential. The pertinent factors will, of course, vary from case to case, but may include written company policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information. If employers "consider" information to be confidential but do not really take affirmative steps to treat it as such and maintain exclusivity, *Carpenter* is not satisfied.

33

Court held in *Skilling* that the honest services fraud statute criminalizes only fraudulent schemes effectuated through bribes or kickbacks. Since that decision, we have recognized that a district court's pre-*Skilling* failure to charge a jury that it must find bribes or kickbacks may require vacating the conviction unless the error is harmless. *United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011); *see also United States v. Bahel*, 662 F.3d 610, 634-35 (2d Cir. 2011). An error is harmless in this context if it is "'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011) (quotation marks omitted) (quoting *Neder v. United States*, 527 U.S. 1 (1999)). Where, as here, the source of an alleged jury instruction error is a supervening decision, we employ a "modified plain-error rule, under which the government, not the defendant, bears the burden to demonstrate that the error . . . was harmless." *Bahel*, 662 F.3d at 634 (quotation marks omitted).

Here, the closest the district court came to instructing that honest services fraud required bribery or any sort of quid pro quo was in its supplemental plain English charge, when it described the honest services fraud statute as "a kind of anti kickback or anti bribery law." This bare bones statement was not adequate. It did not sufficiently explicate the bribery or kickbacks element of honest services fraud; it merely reiterated that honest services fraud occurs when an individual is "not giving his honest and faithful services" to his employer.

The jury in the first trial acquitted on numerous substantive Travel Act counts as well as a Travel Act conspiracy count that alleged bribes. The jury in the retrial was deadlocked prior to requesting a plain English definition of honest services fraud. Under these circumstance, there is a real possibility that the ultimate convictions with regard to honest services fraud were based on

34

the jury's determination that the Broker Defendants deprived their employers of their honest services, although the jury may well not have concluded that bribery occurred. In any event, without a charge that adequately explained what *Skilling* made clear the law requires, it is not clear beyond a reasonable doubt that the Defendants' convictions rested on unanimous findings of bribes or kickbacks. Accordingly, the convictions on honest services fraud grounds are vacated.

## V.

We briefly consider the defendants' double jeopardy argument. As they did prior to retrial, the Defendants argue that retrial should have been barred under the Double Jeopardy Clause of the Fifth Amendment and collateral estoppel because the factual issues that were necessarily decided at their first trial preclude conviction with regard to the charged securities fraud conspiracy. We previously concluded that the defendants' acquittal of conspiracy to violate the Travel Act did not foreclose retrial of conspiracy to commit securities fraud. We adhere to that conclusion on this appeal.

## VI.

Because we vacate the defendants' convictions on the grounds discussed above, we decline to reach their remaining arguments as moot, including those concerning sentencing, Mahaffy's SEC debarment, and whether the government's case, as tried, prejudicially varied from the operative indictment. We write briefly, however, to address forfeiture. The district court imposed forfeiture against each Broker Defendant in the amount of the gross commissions

35

that Watley paid to each Broker Defendant's employer, and jointly against the Watley Defendants in the total amount of commissions paid by Watley to the brokerage firms.

Under 18 U.S.C. § 981(a)(1)(C), the "proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture to the government. "Fraud in the sale of securities" is a "specified unlawful activity" pursuant to 18 U.S.C. §§ 1956(c)(7) and 1961(1)(D). Section 981(a)(2) defines "proceeds" as follows:

> (A) In cases involving illegal goods, illegal services, [and] unlawful activities . . . the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.
>
> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. . . .

The government argued below and argues now that forfeiture of gross proceeds is appropriate under § 981(a)(2)(A). The district court apparently agreed, although it denied a defense request for clarification as to why gross proceeds, rather than net proceeds, is the appropriate measure of forfeiture.

Because approximately seventy percent of the commission payments went to the brokerage firms rather than the Broker Defendants themselves, there is a substantial difference between the gross amounts paid to the employer firms and the net amounts that each Broker Defendant pocketed. The Broker Defendants argue that § 981(a)(2)(B) applies because "the defendants were engaged in lawful conduct – the purchase and sale of securities – in an allegedly

36

unlawful manner – i.e., based upon confidential business information." The government counters that the district court correctly applied the definition in § 981(a)(2)(A) for gross proceeds because fraud in the sale of securities is a "specified unlawful activity" and is thus an "unlawful activity" for purposes of that section.

The Tenth Circuit has held, along with several district courts in our Circuit, that "specified unlawful activity" is not coterminous with "unlawful activities" in § 981(a)(2)(A); instead, § 981(a)(2)(A) encompasses inherently unlawful activities, such as robbery, that are not captured by the words "illegal goods" or "illegal services." *See, e.g.*, *United States v. Nacchio*, 573 F.3d 1062, 1088-89 (10th Cir. 2009); *In re 650 Fifth Ave & Related Prop.*, 777 F. Supp. 2d 529, 550-51 (S.D.N.Y. 2011); *United States v. Kalish*, No. 06-cr-656, 2009 WL 130215, at *6-7 (S.D.N.Y. Jan. 13, 2009). *But see United States v. All Funds on Deposit in United Bank of Switz.*, 188 F. Supp. 2d 407, 410-12 (S.D.N.Y. 2002).

The government's reading renders § 981(a)(2)(B) essentially meaningless. Almost every predicate crime listed in § 981(a)(1)(C) is also a "specified unlawful activity" listed in § 1956(c)(7). If every "specified unlawful activity" is subject to gross forfeiture under § 981(a)(2)(A), there would be only a handful of statutes involving counterfeiting, forgery, explosive materials, and fraudulent identification documents that would fall under the auspices of § 981(a)(2)(B). That interpretation would also lead to peculiar results. Some cases involving lawful goods or lawful services would be subject to forfeiture under § 981(a)(2)(B) while other cases involving lawful goods or lawful services, by virtue of constituting a "specified unlawful activity," would be subject to gross forfeiture under § 981(a)(2)(A).

Having concluded that § 981(a)(2)(A) does not necessarily apply, we turn to whether the defendants' conduct involved "unlawful activities" under subsection (A) or "lawful goods or lawful services" sold in an illegal manner under subsection (B). We agree with the Broker Defendants in this regard. The alleged scheme involved the purchase and sale of securities. Trading those securities, as a general matter, is not unlawful. Rather, any illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and frontrunning. If the district court addresses the forfeiture issue again, with the same factual and legal bases, the proper measure of forfeiture for each Broker Defendant is his net, not gross, gain (that is, the gross commissions paid to him less the significant portion of those commissions that went to his employer) under § 981(a)(2)(B).

**CONCLUSION**

For the reasons discussed above, we **VACATE** the defendants' convictions and **REMAND** the case to the district court for further proceedings consistent with this opinion.

38