22-3141-cr
*United States v. Moses*

# United States Court of Appeals
# For the Second Circuit

August Term 2023
Argued: February 12, 2024
Decided: July 26, 2024

No. 22-3141-cr

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

GEORGE MOSES,

*Defendant-Appellant.*[*]

Appeal from the United States District Court
for the Western District of New York
No. 6:19-cr-6074-1, Wolford, *Chief Judge*.

---

[*] The Clerk of Court is respectfully directed to amend the caption accordingly.

Before:    KEARSE, PARK, and PÉREZ, *Circuit Judges*.

George Moses was convicted of mail and wire fraud, money laundering, lying to the FBI, and other charges for defrauding two nonprofit community organizations that he led for several years. The district court (Wolford, *C.J.*) sentenced him to 78 months of imprisonment. Moses challenges 14 of his 28 counts of conviction and argues that (1) the district court improperly excluded from evidence a document he claimed to be his employment contract; (2) the jury instructions on the mail- and wire-fraud counts were erroneous; (3) the evidence was insufficient for his convictions; and (4) the district court committed procedural errors at sentencing. We reject these arguments and **AFFIRM** the judgment of the district court.

————

> FREDERICK P. HAFETZ, Offices of Federick P. Hafetz LLC, New York, NY (Spencer L. Durland, Hoover & Durland LLP, Buffalo, NY, *on the brief*), *for Defendant-Appellant*.
>
> RICHARD A. RESNICK (Monica J. Richards, *on the brief*), Assistant United States Attorneys, *for* Trini E. Ross, United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee*.

————

2

PARK, *Circuit Judge*:

George Moses was convicted of mail and wire fraud, money laundering, lying to the FBI, and other charges for defrauding two nonprofit community organizations that he led for several years. The district court (Wolford, *C.J.*) sentenced him to 78 months of imprisonment. Moses challenges 14 of his 28 counts of conviction and argues that (1) the district court improperly excluded from evidence a document he claimed to be his employment contract; (2) the jury instructions on the mail- and wire-fraud counts were erroneous; (3) the evidence was insufficient for his convictions; and (4) the district court committed procedural errors at sentencing. We reject these arguments and affirm the judgment of the district court.

## I. BACKGROUND

George Moses ran two community non-profit organizations, North East Area Development (NEAD) and Rochester Housing Charities (RHC). NEAD provided housing, rehabilitation, and other services to low-income residents in Rochester, New York. It operated two sub-entities: Freedom Community Enterprises, Inc. (FCE), a for-profit affiliate intended to diversify NEAD's revenue stream, and Group 14621 Community Association, Inc., a non-profit affiliate. Moses was the Executive Director of NEAD from 2010 to 2019.

RHC provided affordable housing to Rochester residents and was funded in significant part by the Department of Housing and Urban Development (HUD). RHC received three apartment complexes worth around $5 million from the Rochester Housing Authority (RHA), of which Moses was the Chairman of the Board of

3

Commissioners. Although Moses was not an officer or board member of RHC, he used his influence to place several of "his people" from NEAD at RHC, through whom Moses effectively ran RHC.

The evidence at the trial, viewed in the light most favorable to the government, showed that for about five years, Moses defrauded NEAD, RHC, and related entities with several schemes. He used funds from RHC, NEAD, FCE, and Group 14621 for personal expenses, including a timeshare in Florida, cruise tickets for his family, health and wellness products, immigration services for his girlfriend, car repairs, and basketball tickets. He also defrauded RHC into funding projects that benefited other entities, like NEAD and FCE, making payments for nonexistent services or fake invoices, and overpaying its Executive Director's salary and then taking a portion of the overpaid amounts for himself.

The government secured a 29-count fifth superseding indictment charging Moses with various federal crimes. After a seven-week jury trial, Moses was convicted on all but one of the counts. The jury found Moses guilty of mail and wire fraud, conspiracy to commit mail and wire fraud, money laundering, federal program theft, making false statements, and filing false income tax returns. Half of the 28 counts of conviction are at issue in this appeal. We divide them into two categories: Counts 18-23 are the "NEAD counts"; Counts 6, 10-13, and 15-17 are the "RHC counts."

On the NEAD counts, the jury found that Moses committed mail and wire fraud (in violation of 18 U.S.C. §§ 1341 and 1343, respectively) by using funds belonging to NEAD or its sub-entities,

4

FCE and Group 14621, to pay for personal expenses. Specifically, he bought a timeshare near Orlando for himself using NEAD and FCE funds (Count 18). He used FCE's credit card to buy cruise tickets (Count 19), then paid the credit card bill with checks from NEAD (Count 20). He paid for personal expenses—including YMCA memberships, dental expenses, $4,800 in essential oils, five years of a Netflix subscription, and Knicks tickets, among many others—using NEAD funds (Counts 21 and 22). And he paid his credit card bills with Group 14621 funds (Count 23).

On the RHC counts, the jury found Moses guilty of wire fraud (Counts 6, 11, 13, 16), conspiracy to commit wire fraud (Count 10), and federal program theft (Counts 12, 15, 17). Moses used RHC funds to pay a contractor for work performed for NEAD (Count 6). He conspired with Janis White, a NEAD board member, to commit wire fraud, in violation of 18 U.S.C. § 1349, by duping RHC into paying a shell company, HJJ Property Development, Inc., for services rendered either to NEAD or to no one at all, and paying HJJ Property for services rendered to RHC by another contractor (Count 10). He successfully directed fraudulent payments from RHC to HJJ Property (Count 11). And he embezzled or stole more than $5,000 from RHC, which itself had received more than $10,000 in federal funding in the prior year, in violation of 18 U.S.C. § 666(a)(1)(A) (Count 12). As with the NEAD counts, the jury found that Moses used RHC funds to pay off his personal credit cards (Count 13). He had RHC pay FCE for a new refrigerator, as well as snow removal, lawn care, and printing services, that were not provided to RHC; he also had RHC overpay FCE for a 1997 Chevrolet Silverado and a 2009 Chevrolet Suburban

5

(Count 15).  Finally, Moses defrauded RHC by increasing the salary of RHC's Executive Director, Ryan Van Alstyne, who signed off on all of RHC's invoices and documents (Counts 16 and 17).

At sentencing, the district court calculated a Guidelines range of 70 to 87 months before imposing a sentence of 78 months.  Moses appeals, challenging various aspects of his conviction and sentence as to the NEAD and RHC counts.

## II. DISCUSSION

Moses raises several arguments on appeal.  He argues that: (1) the district court abused its discretion when it excluded evidence of his alleged employment contract; (2) the district court gave improper jury instructions on the mail and wire fraud counts; (3) the evidence was insufficient for conviction on the NEAD and RHC counts; and (4) his sentence was procedurally unreasonable.

A.    Employment Contract

Moses sought to introduce at trial a document that he claimed was his employment agreement with NEAD, which supposedly included allowances for various reimbursements.  The district court excluded the document because Moses was unable to authenticate it.  Moses says this was an abuse of the district court's discretion.

1.    *Relevant Facts*

Moses offered as Exhibit 5515 what he claimed was his NEAD employment agreement.  The purported agreement appeared to be signed by Moses and three of NEAD's board members—Janis White,

6

Robert Benjamin, and Tiffany Benjamin. Section 4 of the document, titled "Compensation," acknowledged that NEAD owed Moses $10,000 in backpay and promised Moses health insurance for his family, four weeks of paid vacation, a monthly cell-phone reimbursement of $150/month, and a bonus of 2.25% on new or increased revenue.

At trial, Moses wanted to use the document to argue that he was entitled to the funds he received from NEAD. But before the Exhibit could be admitted for the jury's consideration, the district court required Moses to authenticate it under Federal Rule of Evidence 901. Moses made attempts to do so but was unsuccessful.

Moses first tried to authenticate Exhibit 5515 through the testimony of Jace Lee, the paralegal who had accompanied Moses to NEAD's office where Lee supposedly found the document. Lee provided a declaration explaining where and how he found the document, and Moses sought his testimony at trial. But at trial, instead of calling Lee, Moses called Tiffany Benjamin, a member of NEAD's Board whose signature appeared on the purported agreement. Benjamin testified that she could not identify Exhibit 5515 as the document she signed in 2010. The court found Benjamin's testimony to be inadequate because "at no point was she able to identify Exhibit 5515 or testify that the document was a fair and accurate copy of the document that she signed." App'x at 4971.

The district court invited Moses to call another witness to authenticate the Exhibit, adding that "if testimony was presented linking . . . Exhibit 5515[] to NEAD's offices, that may be enough

7

to . . . nudge the document over the line." *Id.* at 4972. But Moses was unable to produce a witness who could provide such testimony. So the district court concluded that Moses failed to authenticate the purported agreement and excluded it under Rule 901.

> 2. *Analysis*

"We review a district court's evidentiary rulings for abuse of discretion." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). "A district court has broad discretion to determine whether a piece of evidence has been properly authenticated." *United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004). Federal Rule of Evidence 901 governs the authentication of evidence and "is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Al-Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (quotation marks omitted). The "bar for authentication of evidence is not particularly high, and proof of authentication may be direct or circumstantial." *Id.* (cleaned up). Rule 901 offers a nonexhaustive list of evidence that satisfies its requirements including—relevant here—testimony of a witness with knowledge. *See* Fed. R. Evid. 901(b)(1).

The district court acted well within its discretion in excluding Moses's purported employment agreement. The district court determined that Tiffany Benjamin's testimony did not meet Rule 901's authentication standard because she could not testify that the exhibit was the document she claimed to have signed in 2010.

The district court also considered other evidence suggesting that Exhibit 5515 may have been fabricated. First, two key players at

NEAD—Board President Regina Seabrook and Executive Assistant Shirley Boone—testified that they were unaware of any employment agreement between Moses and NEAD. Second, the document contained numerous inconsistencies in font, spacing, and wording, and Section 4—the section containing the provision on which Moses sought to rely—was formatted differently from every other section. Third, Exhibit 5515 was "not produced in response to the subpoena that was served on NEAD."[1] App'x at 4971. Instead, Moses claimed that he "uncovered the document in 2020 when he went to NEAD's offices." *Id*. The one-year gap between pre-trial discovery and discovery of Exhibit 5515; the fact that Moses had access to NEAD's office throughout that time but did not find Exhibit 5515 until he went to the office with Lee; and the fact that among a discovered binder full of employment documents, Lee and Moses chose two documents (Exhibits 5515 and 5516) to turn over to the government, all raised doubt about the authenticity of Exhibit 5515. Excluding Exhibit 5515 was thus not an abuse of discretion.

B.     Jury Instructions

Moses next argues that the district court's jury instructions were incorrect. The district court instructed the jury that fraud can be proven by a failure to disclose material information. Moses argues

---

[1] On March 15, 2019, the government sent a subpoena to NEAD requesting documents relating to financial transactions, payroll records, vendor records, policies and procedures, and expense reimbursements relating to Moses starting in 2015. The district court agreed with the government that Exhibit 5515 should have fallen within the scope of the subpoena because it was allegedly extended into 2015 by Exhibit 5516.

that this instruction was improper because he had no duty to disclose his spending to NEAD. He also argues that the district court should have included an instruction that the approval of his actions by an authorized agent of RHC would constitute ratification of his decisions.

"We review a claim of error in jury instructions *de novo*, reversing only where appellant can show that, viewing the charge as a whole, there was a prejudicial error." *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016) (quotation marks omitted). "An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Id*. (cleaned up).

1.    *Fraud-by-Omissions Instruction*

The district court instructed the jury that: "The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the Defendant actually knew such disclosure was required to be made, and the Defendant failed to make such disclosure with the intent to defraud." App'x at 5437.

The jury instruction was proper. First, a duty to disclose may arise from a fiduciary or similar relationship. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005) (holding that a duty to disclose can arise when "one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge" (quotation marks omitted)); *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68

10

F.3d 1478, 1483 (2d Cir. 1995) (concluding that a duty to disclose "ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust"); *see also SNS Bank, N.V. v. Citibank, N.A.*, 777 N.Y.S.2d 62, 66 (1st Dep't 2004) (stating that an affirmative duty to disclose arises when there is a fiduciary relationship between parties).

Second, Moses argues that the jury instruction was too broad and should have been limited. *United States v. Mahaffy* doesn't help his case because it did not involve jury instructions for mail and wire fraud. *See* 693 F.3d 113, 125-26 (2d Cir. 2012). Although *Mahaffy* held that a violation of an affirmative disclosure policy was sufficient evidence to prove a violation of a duty to disclose, *see id*. at 126, it does not follow that an affirmative disclosure policy is required to prove fraud. Moses misconstrues *Mahaffy* to impose a requirement that the law does not require.

In any event, the jury was instructed that in order to find Moses guilty of failing to make a required disclosure, it had to find that Moses "actually knew such disclosure was required to be made." App'x at 5437. This necessarily meant that the jury also had to find that Moses understood the existence of some duty. We review the instructions as a whole, and the fact that the jury had to find that Moses knew he had a duty to NEAD and RHC is inconsistent with his theory that the jury was free to imagine a nonexistent legal duty.

And indeed, NEAD and RHC witnesses testified that Moses knew that he was expected to disclose his spending and failed to do so. In one instance, Moses did not disclose either to the NEAD Board

11

or to his executive assistant Boone his Florida Westgate Resorts timeshare purchase using NEAD and FCE funds. When a NEAD bookkeeper confronted Moses about the purchase, he lied and said that the expenses were related to a franchise expansion. He falsely claimed that he informed the NEAD Board before making the timeshare purchase. Despite his responsibility to "provide the board with updates of significant events," Moses failed to report the timeshare purchase, which the Board President Seabrook testified would have been considered a "[v]ery significant event." App'x at 2439-40. Seabrook also testified that NEAD had an approval process for travel expenses, but Moses disregarded it and instead coordinated with Margaret Moses—his sister and, at the time, a NEAD bookkeeper—to use NEAD funds to pay for a cruise and related expenses for his family. Finally, Moses directed Boone, who was also RHC's bookkeeper, to increase the salary of RHC Executive Director Van Alstyne even though he knew that all payroll matters had to go through the RHC Board, and he had no authority to change Van Alstyne's salary or to make any purchases on behalf of RHC. Moreover, a reasonable jury could find that Moses knew his expenditures on personal items—such as dietary supplements, meal replacements, muscle gain and post-workout shakes, a fitness contraption called Ab Doer 360, spa and salon services, and laundry services—were not permitted uses of NEAD funds, but Moses nonetheless spent corporate funds on those expenses without disclosing them.

In short, the jury instruction appropriately allowed the jury to consider various factors—*e.g.*, Moses's organizational position, his

responsibilities and obligations associated with his position, his knowledge of these obligations, and his failure to meet them with the intent to defraud—to determine whether his failure to disclose material information constituted fraud by omission.

### 2. D'Amato *Agency Instruction*

Moses argued below that Van Alstyne was a good-faith agent of RHC who approved Moses's expenses on behalf of RHC. To that end, Moses requested an instruction that read: "The mail-fraud statute does not criminalize the charging of an allegedly excessive fee where a corporate agent with at least apparent authority to spend the entity's money agreed to the fee, received no personal benefit from the fee, and was not deceived by the defendant." App'x at 5752; *see United States v. D'Amato*, 39 F.3d 1249, 1261-62 (2d Cir. 1994). The district court declined to give the requested instruction. On appeal, Moses argues that the failure to instruct the jury about Van Alstyne's authority requires a new trial as to the RHC fraud counts.

We disagree because *D'Amato* is inapplicable. The "apparent authority" rule that Moses extracts from *D'Amato* arose from a retainer agreement between a corporation and the defendant who had been hired as a consultant and lobbyist. An agent for the corporation asked the defendant to bill for work that he would not need to do. But here, no evidence suggests that Van Alstyne was the architect of Moses's fraud or that he provided any assurance to Moses that his billing practices were acceptable. We have never held that *D'Amato* cleanses fraud if the fraudster manages to get a corporate endorsement. *Cf. United States v. Gatto*, 986 F.3d 104, 129 (2d Cir. 2021)

13

(distinguishing *D'Amato* because the corporate agents never agreed to or instructed defendants to engage in fraudulent conduct). Moreover, the defendant's state of mind in both cases is distinct. The defendant in *D'Amato* did not believe or have reason to believe that his actions were improper or that the agent was acting in bad faith. *See D'Amato*, 39 F.3d at 1261; *cf. Gatto*, 986 F.3d at 128 (finding unreasonable the argument that defendants believed that the corporate agents were acting in good faith). Here, there is ample evidence that Moses knew that his billing practices at RHC were fraudulent. It is irrelevant whether Moses believed that Van Alstyne was acting in good faith because Moses was the mastermind behind the fraud scheme. The district court appropriately omitted the proposed *D'Amato* charge.

## C.     Sufficiency of the Evidence

Moses next argues that the government failed to present sufficient evidence to support the jury's guilty verdict.

### 1.     *Legal Standard*

We "review[] de novo a challenge to the sufficiency of evidence supporting a criminal conviction, and must affirm if the evidence, when viewed in its totality and in the light most favorable to the government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) (citation omitted). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

14

*United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020) (quotation marks omitted). "A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

"'The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation.'" *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)). "We must credit every inference that the jury might have drawn in favor of the government because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *Atilla*, 966 F.3d at 128 (cleaned up).

2.     *Analysis*

In light of our conclusion that the district court's jury instructions were proper, when viewed in its totality and in the light most favorable to the government, the evidence was sufficient to prove the NEAD and RHC counts against Moses.

a.     Mail and Wire Fraud

To prove mail or wire fraud under 18 U.S.C. § 1341 and § 1343 respectively, the government must establish: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Finazzo*, 850 F.3d 94, 105 n.12 (2d Cir. 2017) (quotation marks omitted). The statutes "do not define scheme to defraud, but it has been described as a plan to deprive a person of something of value by trick, deceit,

15

chicane or overreaching." *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (quotation marks omitted).

The government provided sufficient evidence in charging Moses for mail or wire fraud under Counts 6, 11, 13, 16, and 18-23.

As to Count 6, Moses generated false invoices, causing RHC to pay a subcontractor $21,800 for services performed for NEAD (*e.g.*, roof repair, interior repairs, and other exterior repairs at various sites). This was supported by the testimony of RHC staff members.

As to Count 11, Moses engaged in another fraud scheme with Janis White to make RHC pay HJJ Property. Moses caused RHC to pay HJJ Property for services, including a roof repair and A/C installation, that were never performed for RHC, and to pay HJJ Property for services performed by another contractor (*i.e.*, paying HJJ Property for repairs to a boiler system made by a contractor called High Performance). Although neither Christina Irish, head of RHC's construction department, nor Kevin White, RHC's Director of Operations, knew what HJJ Property was, HJJ Property's bank records showed deposits totaling $87,069 from RHC.

As to Count 13, Moses used RHC funds to pay off $4,407 of his personal credit card debt, including a charge of airline tickets for him, his family, and Van Alstyne for a trip to Florida.

As to Count 16, Moses directed Boone to increase Van Alstyne's salary by $500 per pay period, then had $380 of it direct-deposited to Moses's personal account, although he was unauthorized to do so.

As to Count 18, Moses used unauthorized NEAD and FCE funds to acquire a partial timeshare at Westgate Resorts in Florida for family vacation use and to pay for travel expenses related to the timeshare purchase. Not only was the NEAD Board unaware of the timeshare purchase, but Moses also lied about the purchase when the NEAD bookkeeper at the time asked about it.

As to Counts 19 and 20, Moses used unauthorized NEAD funds to buy cruise tickets for him and his family, drawing checks on NEAD and FCE bank accounts to pay off the FCE credit card balance of all the purchases.

As to Counts 21 and 22, Moses used a NEAD credit card for the unauthorized purchases of personal items and services, including a personal Netflix subscription, weight loss treatments, essential oils, GNC products, spa expenses, YMCA memberships, an Ab Doer 360, products from a multilevel marketing company, Knicks tickets, and roughly $8,000 in immigration services for his Canadian girlfriend.

As to Count 23, Moses sent a wire transfer from Group 14621's bank account to pay off $4,000 on his personal card. He sent a fraudulent "Payment confirmation" email to Boone, disguising the payment as for "Legal Services for construction material sourcing" that was "[m]istakenly put on [his] credit card." App'x at 898. But Moses's credit card billing statements did not show that he made the purported legal services purchase.

In short, the evidence was sufficient to prove that Moses committed mail and wire fraud.

### b. Conspiracy To Commit Mail and Wire Fraud

The relevant conspiracy statute provides: "Any person who . . . conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." 18 U.S.C. § 1349.

In addition to the evidence provided in support of Count 11 for wire fraud, *see supra* at Section II(C)(2)(a), the government provided sufficient evidence to convict Moses for conspiracy to commit wire fraud under Count 10. Co-conspirator Janis White prepared fraudulent invoices from HJJ Property to RHC for services that were never performed. She then sent the fraudulent invoices to Moses who approved them; RHC subsequently made the fraudulent payments to HJJ Property.

### c. Federal Program Theft

"Whoever . . . being an agent of an organization . . . corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more" shall be guilty of a crime. 18 U.S.C. § 666(a)(1).

The government provided sufficient evidence in convicting Moses for federal program theft under Counts 12, 15, and 17. Counts 12 and 17 are supported by the evidence provided in Counts 10 and

11, and Count 16 respectively. *See supra* at Section II(C)(2)(a), (b). As to Count 15, Moses caused FCE to issue false invoices to RHC, which was federally funded by HUD, to pay for a refrigerator, as well as snow removal, lawn, printing, and landscaping services, even though RHC already owned or operated all of those amenities and services. Moses caused FCE to purchase a 2009 Chevrolet Suburban for his personal use with Group 14621 funds, as well as a 1997 Chevrolet truck using NEAD funds. He then had FCE sell the vehicles to RHC and invoice RHC at an inflated price for the vehicles (*i.e.*, Moses bought the Suburban for $13,000 then had it sold for more than $16,000; he bought the truck for $4,750 then had it sold for $9,500). But Moses continued to drive the Suburban in his personal capacity, registering and insuring it under his name.

We conclude that there was ample evidence to support Moses's conviction on the NEAD and RHC counts.

D.    Sentencing

The district court calculated a Guidelines range of 70 to 87 months of imprisonment and sentenced Moses to 78 months. Moses claims that the district court improperly increased his sentence after conflating his assertion of mitigating circumstances with a failure to accept responsibility. He also contends that the court committed further procedural errors in justifying the disparity between his sentence and that of his co-conspirator, Adam McFadden.

19

1. *Legal Standard*

Sentencing decisions are reviewed for reasonableness under a "deferential abuse-of-discretion standard." *United States v. Degroate*, 940 F.3d 167, 174 (2d Cir. 2019) (quotation marks omitted). "Abuse of discretion may be found where the court has made either an error of law or a clearly erroneous finding of fact, or where its ruling cannot be located within the range of permissible decisions." *United States v. Estevez*, 961 F.3d 519, 529 (2d Cir. 2020) (quotation marks omitted). "A district court commits procedural error where it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Robinson*, 702 F.3d 22, 38 (2d Cir. 2012).

2. *Analysis*

The district court acted well within its discretion in sentencing Moses. First, the district court properly addressed why Moses's co-defendant McFadden was not a "good comparator" in considering "the need to avoid unnecessary sentencing disparities among defendants with similar records who have been found guilty of similar conduct." App'x at 5614-15. By carefully calculating and reviewing Moses's Guidelines range, the district court "necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007); *see United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009) ("[A] reviewing court's concern about unwarranted disparities is at a minimum when

a sentence is within the Guidelines range." (quotation marks omitted)).

We have also held that 18 U.S.C. § 3553(a)(6) "requires a district court to consider nationwide sentence disparities, but does not require a district court to consider disparities between co-defendants." *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008). In any event, the district court did consider the disparities between Moses and McFadden and determined that the two were not similarly situated. McFadden was convicted of fewer crimes than Moses; McFadden's loss amount was about $100,000 less than Moses's; and McFadden pleaded guilty, accepted responsibility, and cooperated with the government while Moses did not. *Cf. United States v. Fernandez*, 104 F.4th 420, 429 (2d Cir. 2024) (declining to reduce defendant's sentence because "[t]here is nothing extraordinary or compelling about a sentence disparity that results from a co-defendant's decision to plead guilty and assist the government" (quotation marks omitted)); *United States v. Cruz*, 977 F.2d 732, 734 (2d Cir. 1992) ("We have recognized that th[e] discount [for acceptance of responsibility] is lawful, rejecting the contention that withholding such leniency would be impermissible punishment.").

Second, Moses argues that the district court erred by conflating his statements in mitigation with a failure to accept responsibility.[2] In

---

[2] Moses points to *United States v. Singh*, 877 F.3d 107 (2d Cir. 2017), which is inapplicable here. The defendant in *Singh* accepted responsibility, and his statements in question were not inconsistent with his acceptance. Moses did not accept responsibility.

21

his attempt to mitigate the seriousness of his conduct, Moses stated that "none of the victim organizations suffered any serious injury" and that he "obtained[] for these organizations[] far more than he took."  App'x at 5611.  The district court responded that this sentiment "reflect[ed] a refusal on [Moses's] part to acknowledge the seriousness of [his] crimes."  *Id*.  This was appropriate.  The sentencing colloquy shows that the district court made its statement about other sentencing factors—seriousness of the offense, amount of harm caused, and risk of recidivism—and not necessarily with respect to a failure to accept responsibility.  *See* App'x at 5610-12.

Third, Moses argues that the district court incorrectly calculated his loss amount because he was entitled to a credit against loss.  The credit-against-loss concept provides that loss is to be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected."  U.S.S.G. § 2B1.1., cmt. n.3(E)(i).  But Moses did not return the money or property that he originally took from the victims.  He instead seeks credit toward his loss amount for money that he stole from one victim to pay another— a theory that distorts the purpose of the credit-against-loss rule to restore the victim at the defendant's own expense.  The district court's decision not to credit the value of money that went back to the victims against the losses resulting from Moses's fraud scheme was appropriate.  In any event, even if the district court had factored in the purported credit against loss, Moses's adjusted offense level would have remained the same.

22

### III.  CONCLUSION

We have considered Moses's remaining arguments and find them to lack merit.  Accordingly, we affirm the judgment of the district court.